## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DANIEL BRADY,<br><br>                  Plaintiff,<br><br>     -against-<br><br>GW PHARMACEUTICALS, PLC,<br>GEOFFREY GUY, JUSTIN GOVER, CABOT<br>BROWN, DAVID GRYSKA, CATHERINE<br>MACKEY, JAMES NOBLE, ALICIA<br>SECOR, and LORD WILLIAM<br>WALDEGRAVE,<br><br>                  Defendants. | Case No.: _____<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Daniel Brady ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

### NATURE OF THE ACTION

1.      This is an action brought by Plaintiff against GW Pharmaceuticals, PLC ("GW" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with GW, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9. Plaintiff's claims arise in connection with the proposed acquisition of GW by Jazz Pharmaceuticals, PLC ("Jazz") and its subsidiary, Jazz Pharmaceuticals UK Holdings Limited ("BidCo") (the "Proposed Merger").

2.      On February 3, 2021, GW entered into an agreement and plan of merger by and

among (i) the Company, (ii) Jazz, and (iii) BidCo (the "Merger Agreement"), pursuant to which the holders of GW ordinary shares will receive $16.66^{2/3} in cash plus an amount of Jazz ordinary shares equal to an exchange ratio that will be calculated based upon Jazz's share price, and holders of American Depositary Shares of GW ("GW ADSs") will receive approximately $200 per share in cash and $20 in Jazz stock in consideration for their shares (the "Merger Consideration").

3.    In order to convince GW's shareholders to vote for the Proposed Merger, on March 15, 2021, the Board authorized the filing of a materially incomplete and misleading Schedule 14A Proxy Statement (the "Proxy") with the SEC. In particular, the Proxy contains materially incomplete and misleading information concerning: (i) the Company's financial projections; (ii) the fairness opinion and financial analyses performed by the Company's financial advisors, Goldman Sachs & Co. LLC ("Goldman Sachs") and Centerview Partners LLC ("Centerview" and together with Goldman Sachs, the "Financial Advisors"); and (iii) the interests of the Individual Defendants in the Proposed Merger and steps taken to isolate those potential conflicts.

4.    Disclosure of this information is critical, as the shareholder vote is scheduled to occur on April 23, 2021 (the "Shareholder Vote") and the Proposed Merger is expected to close in the second quarter of 2021. It is imperative that the material information that has been omitted from the Proxy be disclosed to the Company's stockholders prior to the Shareholder Vote so they can properly determine whether to vote for or against the Proposed Merger.

5.    For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Merger unless and until the material information discussed below is disclosed to GW's stockholders sufficiently in advance of the upcoming Shareholder Votes or, in the event the Proposed Merger

is consummated, to recover damages resulting from the Defendants' misconduct.

## JURISDICTION AND VENUE

6.    This Court has original jurisdiction over this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

7.    Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over the Defendants by this Court permissible under traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1305 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section of the Act confers personal jurisdiction over the defendant in any federal district court." *Id*. at 1316. Indeed, GW maintains substantial operations through its subsidiary Greenwich Biosciences, Inc., which is headquartered in the United States.

8.    Venue is proper in this District under Section 27 of the Exchange Act and 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. GW ADSs trade on the Nasdaq stock exchange, which is headquartered in this District, and the Company hired financial and legal advisors for the purposes of the Proposed Merger, which are headquartered in this District, rendering venue in this District appropriate. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

9.      Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of GW ADSs.

10.      Defendant GW Pharmaceuticals, PLC is a company incorporated in the United Kingdom and which maintains its principal executive offices at Sovereign House, Vision Park, Chivers Way, Histon, Cambridge CB24 9BZ, United Kingdom. The Company's ADSs trade on the Nasdaq under the ticker symbol "GWPH".

11.      Individual Defendant Geoffrey Guy is, and at all relevant times has been, the founder of the Company and Chairman of the Board.

12.      Individual Defendant Justin Gover ("Gover") is, and at all relevant times has been, the Chief Executive Officer and Executive Director of the Company.

13.      Individual Defendant Cabot Brown is, and at all relevant times has been, a non-executive director of the Company.

14.      Individual Defendant David Gryska is, and at all relevant times has been, a non-executive director of the Company.

15.      Individual Defendant Catherine Mackey is, and at all relevant times has been, a non-executive director of the Company.

16.      Individual Defendant James Noble is, and at all relevant times has been, the Lead Independent Director and Deputy Chairman of the Company.

17.      Individual Defendant Alicia Secor is, and at all relevant times has been, a non-executive director of the Company.

18.      Individual Defendant Lord William Waldegrave is, and at all relevant times has been, a non-executive director of the Company.

4

19.    The defendants referred to in ¶¶11-18 are collectively referred to herein as the "Individual Defendants" or the "Board" and, together with GW, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**A.    Background of the Proposed Merger**

20.    GW, a public limited company incorporated in England and Wales, discovers, develops, manufactures, and commercializes novel, regulatory approved therapeutics from its proprietary cannabinoid product platform to address a broad range of diseases.

21.    Jazz, a public limited company incorporated in the Republic of Ireland, is a global biopharmaceutical company dedicated to developing and commercializing life-changing medicines, with a focus in neuroscience, including sleep and movement disorders, and in oncology, including hematologic malignancies and solid tumors. Jazz ordinary shares are listed on Nasdaq under the symbol "JAZZ".

22.    On February 3, 2021, GW authorized the issuance of a press release announcing the Proposed Merger, which states in relevant part:

### Jazz Pharmaceuticals to Acquire GW Pharmaceuticals plc, Creating an Innovative, High-Growth, Global Biopharma Leader

DUBLIN and LONDON, Feb. 3, 2021 /PRNewswire/ -- Jazz Pharmaceuticals plc (Nasdaq: JAZZ) and GW Pharmaceuticals plc (Nasdaq: GWPH) today announced the companies have entered into a definitive agreement for Jazz to acquire GW for $220.00 per American Depositary Share (ADS), in the form of $200.00 in cash and $20.00 in Jazz ordinary shares, for a total consideration of $7.2 billion, or $6.7 billion net of GW cash. The transaction, which has been unanimously approved by the Boards of Directors of both companies, is expected to close in the second quarter of 2021.

Upon close of the transaction, the combined company will be a leader in neuroscience with a global commercial and operational footprint well positioned to maximize the value of its diversified portfolio.

GW is a global leader in discovering, developing, manufacturing and commercializing novel, regulatory approved therapeutics from its proprietary

cannabinoid product platform to address a broad range of diseases. The company's lead product, Epidiolex® (cannabidiol) oral solution, is approved in patients one-year and older for the treatment of seizures associated with Lennox-Gastaut Syndrome (LGS), Dravet Syndrome and Tuberous Sclerosis Complex (TSC), all of which are rare diseases characterized by severe early-onset epilepsy. Epidiolex was the first plant-derived cannabinoid medicine ever approved by the U.S. Food and Drug Administration (FDA). This product has also been approved, under the tradename Epidyolex®, by the European Medicines Agency (EMA) in patients two years of age and older for the adjunctive treatment of seizures associated with LGS and Dravet syndrome in conjunction with clobazam and is under EMA review for the treatment of seizures associated with TSC. In addition to the approved indications for Epidiolex, there are considerable opportunities to pursue other indications within the epilepsy field, including other treatment-resistant epilepsies where significant unmet needs of patients exist.

Beyond Epidiolex, GW has a scientific platform and deep innovative pipeline of cannabinoid product candidates, as well as highly specialized manufacturing expertise, developed over two decades of pioneering and building leadership in cannabinoid science. This pipeline includes nabiximols, for which the company is in Phase 3 trials to seek FDA approval for treatment of spasticity associated with multiple sclerosis and spinal cord injury, as well as earlier-stage cannabinoid product candidates for autism and schizophrenia.

"Jazz is proud of our leadership position in sleep medicines and rapidly growing oncology business. We are excited to add GW's industry-leading cannabinoid platform, innovative pipeline and products, which will strengthen and broaden our neuroscience portfolio, further diversify our revenue and drive sustainable, long-term value creation opportunities," said Bruce Cozadd, chairman and CEO of Jazz Pharmaceuticals. "We are joining two teams that share a passion for, and track record of, developing differentiated therapies that advance science and transform the lives of patients. This will help facilitate a successful integration and bring added capabilities to Jazz. Given the strength of our balance sheet and the meaningful financial drivers of the transaction, we are confident in the value we can deliver to both companies' shareholders and patients. We look forward to welcoming the GW team to Jazz to build an even stronger company."

"Over the last two decades, GW has built an unparalleled global leadership position in cannabinoid science, including the successful launch of Epidiolex, a breakthrough product within the field of epilepsy, and a diverse and robust neuroscience pipeline. We believe that Jazz is an ideal growth partner that is committed to supporting our commercial efforts, as well as ongoing clinical and research programs," said Justin Gover, CEO of GW Pharmaceuticals. "We have a shared vision of developing and commercializing innovative medicines that address significant unmet needs in neuroscience and an approach of putting patients first. Together, we will have an opportunity to reach and impact more patients through a broader portfolio of neuroscience-focused therapies than ever before."

23.     The Merger Consideration does not compensate stockholders for the intrinsic value of their shares. The Proposed Merger comes in the midst of the COVID-19 pandemic ("Pandemic"), at a time when stocks throughout the world are subject to great uncertainty and radical change. Piggybacking off the Pandemic, the Proposed Merger provides a substantial discount to Jazz, at the expense of the common stockholders who will not see the intrinsic value of their shares realized nor be able to fully partake in the continued growth of the Company. Therefore, it is imperative that stockholders receive the material information (discussed in detail below) that Defendants have omitted from the Proxy, which is necessary for stockholders to properly determine how to vote their shares.

**B.      The Misleading Proxy Omits Material Information**

24.     On March 15, 2021, Defendants filed the materially incomplete and misleading Proxy with the SEC. The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents or omits material information concerning the Company's financial projections, the interests of the Individual Defendants in the Proposed Merger, and the Financial Advisors' analyses. This information is necessary for GW's stockholders to make an informed decision on how to vote their shares, in violation of Sections 14(a) and 20(a) of the Exchange Act, and SEC Rule 14a-9.

I.      The Company's Financial Projections

25.     First, the Proxy fails to adequately disclose the financial projections prepared by the Company's management. Instead, it provides the following select snippets of certain metrics:

**July Forecasts of GW Management**
**($ in millions)**

| | Fiscal Year Ending December 31, | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2020 E | 2021 E | 2022 E | 2023 E | 2024 E | 2025 E | 2026 E | 2027 E | 2028 E | 2029 E | 2030 E | 2031 E | 2032 E | 2033 E | 2034 E | 2035 E |
| **Total Revenue**[1] | $ 538 | $ 778 | $1,112 | $1,597 | $2,042 | $2,442 | $2,736 | $2,944 | $3,065 | $3,236 | $3,425 | $2,358 | $2,483 | $2,617 | $2,246 | $2,284 |
| **EBIT**[2] | $ (65) | $ 29 | $ 236 | $ 570 | $ 874 | $1,146 | $1,359 | $1,497 | $1,632 | $1,765 | $1,902 | $1,221 | $1,371 | $1,494 | $1,278 | $1,293 |

**December Forecasts of GW Management**
**($ in millions)**

| | Fiscal Year Ending December 31, | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2021 E | 2022 E | 2023 E | 2024 E | 2025 E | 2026 E | 2027 E | 2028 E | 2029 E | 2030 E | 2031 E | 2032 E | 2033 E | 2034 E | 2035 E |
| **Total Revenue**[1] | $ 742 | $1,084 | $1,518 | $1,943 | $2,326 | $2,456 | $2,572 | $2,664 | $2,779 | $2,906 | $1,824 | $1,897 | $1,939 | $1,455 | $1,413 |
| **Gross Profit** | $ 680 | $ 965 | $1,356 | $1,738 | $2,083 | $2,195 | $2,297 | $2,378 | $2,480 | $2,592 | $1,618 | $1,682 | $1,719 | $1,284 | $1,246 |
| **EBIT**[2] | $ 12 | $ 221 | $ 530 | $ 822 | $1,081 | $1,210 | $1,292 | $1,399 | $1,500 | $1,605 | $ 906 | $1,014 | $1,067 | $ 779 | $ 743 |
| **EBIT (Excl. Unallocated R&D)**[3] | $ 12 | $ 221 | $ 530 | $ 857 | $1,155 | $1,303 | $1,471 | $1,619 | $1,745 | $1,882 | $1,108 | $1,164 | $1,200 | $ 849 | $ 808 |

26.     If a Proxy discloses financial projections and valuation information, such projections must be complete and accurate.  The question here is not the duty to speak, but liability for not having spoken enough. With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. Accordingly, to the extent that this information is readily available, Defendants must disclose: (i) Stock-based Compensation; (ii) Net Debt; (iii) Net Income/Loss; and (v) Dividends. Failure to do so will result in shareholders not having all material information available and, should the merger be consummated, will cause shareholders to lose the intrinsic value of their shares.

27.     Second, the Proxy fails to provide full disclosure regarding the reasons that led management to significantly reduce their projections. As outlined in the Proxy and noted above, management created two sets of projections: the July Forecasts and the significantly reduced December Forecasts. The reductions in the December Forecasts appear to be contrary to GW's experienced growth between the creation of the July Forecasts and December Forecasts. Indeed, as stated in their Q3 2020 Earnings Call Transcript on November 3, 2020:

Overall, I'm very pleased to report a strong quarter with total revenue in Q3 of $137 million, the sequential growth the 13% over the prior quarter and 51% over the prior year quarter. Year-to-date, total revenue is $379 million, representing 87% growth over the prior year.

While the pandemic makes for more challenging commercial backdrop, we are confident that Epidiolex has all the characteristics to continue to exhibit strong growth in the months and years to come.

Yet despite this improvement, EBIT for the December Forecasts is roughly 12.5% lower on average for each metric than the July Forecasts.

28.    Though Defendants disclose certain assumptions underlying the preparation of the December Forecasts, many of these assumptions vaguely identify the removal of certain ailments as target indications for certain of the Company's products and/or product candidates without quantifying the impact these assumptions had on the Company's projections. By way of example, the Proxy indicates that the December Forecasts reflect:

- the removal of Rett Syndrome as a target indication for Epidiolex in light of the suspension of GW's ongoing Phase 3 clinical trial of Epidiolex in children with Rett Syndrome due to the impacts of the COVID-19 pandemic;
- the removal of PTSD as a target indication for nabiximols / Sativex given GW's decision after the July Forecasts had been prepared to delay the initiation of a planned study of nabiximols in PTSD and reassess the study in the second half of 2021;
- the removal of broad spasticity as a target indication for nabiximols / Sativex given that GW had already incorporated multiple sclerosis spasticity and spinal cord injury spasticity as target indications and a clinical program for broad spasticity had not yet been determined;

However, the forecasts provided in the Proxy do not delineate the underlying financial line items relating to each product candidate and/or ailment or the impact (percentage or otherwise) the removal of the ailments has on the Company's financial forecasts. Without this information shareholders are unable to determine whether the December Forecasts (and the reductions therein) are reasonable in light of the Company's demonstrated growth during the period preceding their preparation.

II.    The Financial Advisors' Analyses

29.    The Proxy describes the Financial Advisors' fairness opinions and valuation

analyses performed in support of their opinions, yet omits critical information. Defendants concede the materiality of this information in citing the Financial Advisors' fairness opinions and their valuation analyses among the reasons for recommending the Proposed Merger to GW shareholders. However, the summaries of the fairness opinions and analyses provided in the Proxy fail to include key inputs and assumptions. Without this information, as described below, GW's shareholders are unable to fully understand the analyses and, thus, are unable to determine what weight, if any, to place on the Financial Advisors' fairness opinions in deciding whether to vote in favor of the Proposed Merger. The following omitted information, if disclosed, would significantly alter the total mix of information available to GW's shareholders.

30.      For example, and third, in summarizing Centerviews' *Selected Public Company Analysis*, Defendants must disclose all of the inputs of the individual companies and metrics observed by Centerview. Without providing this information stockholders are unable to assess whether the companies selected by Centerview were reasonable.

31.      Fourth, with respect to Centerviews' *Selected Transactions Analysis*, Defendants must disclose all of the metrics observed and the individual premiums paid for each of the transactions observed.

32.      Fifth, with respect to Centerviews' *Discounted Cash Flow Analysis* ("DCF"), the Proxy fails to disclose: (i) the terminal value for the Company; (ii) the basis for assuming that unlevered free cash flows would decline in perpetuity after December 31, 2035 at a range of rates of free cash flow decline of 10% to 40% year over year; (iii) the basis for applying the discount rate range of 9.5% to 11.5%; and (iv) all other company specific inputs such as the Company's target capital structure weightings, the cost of long-term debt, after-tax yield on permanent excess cash, if any, future applicable marginal cash tax rate and beta.

33.    <u>Sixth</u>, with respect to Goldman Sachs' *Illustrative Discounted Cash Flow Analysis*, the Proxy fails to disclose: (i) the Company's weighted average cost of capital; (ii) the terminal value; (iii) the basis for applying perpetuity growth rates ranging from 0.0% to 2.0%; (iv) the basis for utilizing the capital asset pricing model method; (iv) the basis for selecting a discount rate of 9.5% to 11.5%; and (v) all other company specific inputs including the company's target capital structure weightings, the cost of long-term debt, after-tax yield on permanent excess cash, if any, future applicable marginal cash tax rate and a beta for the company.

34.    <u>Seventh</u>, with respect to Goldman Sachs' *Premia Analysis*, Defendants must disclose the metrics observed and the individual premiums paid for each of the transactions observed.

35.    These key inputs are material to GW shareholders, and their omission renders the summary of the fairness opinions incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles explaining the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions: in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" *Id.* As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. *This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices.* The substantial discretion and lack of guidelines and standards also makes the process vulnerable

to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id*. at 1577-78 (emphasis added). Without the above material information, GW shareholders cannot evaluate for themselves the reliability of the Financial Advisors' fairness opinions, make a meaningful determination of whether the implied equity value per share range reflects the true value of the Company or was the result of the Financial Advisors' unreasonable judgment, and make an informed decision regarding whether to vote in favor of the Proposed Merger.

III.    Potential Conflicts of Interest

36.    Eighth, and importantly, the Proxy omits material information relating to potential conflicts of interest faced by the Board and/or the Company's management in their pursuit and negotiation of the Proposed Merger. Specifically, the Proxy must disclose additional information relating to the Board's decision to engage "Radford, the independent compensation consultant of the Remuneration Committee of the GW Board (the 'Remuneration Committee')" and the subsequent changes made to the Company's severance program, as recommended by Radford.

37.    More specifically, the Proxy indicates that Jazz made an unsolicited non-binding proposal to acquire the Company on July 8, 2020, which was rejected by the Board on or about July 17, 2020. Less than one month later, on August 13, 2020, Jazz transmitted a revised non-binding proposal to acquire the Company, which the Board again rejected. On September 11, 2020, Jazz reiterated its revised proposal of August 13, 2020, and indicated that it was willing to consider an increase in its proposal if GW would permit Jazz to conduct limited due diligence. Although the Board again rejected this proposal on September 17, 2020, privately it became interested in exploring a sale and engaged the Financial Advisors following Jazz's August 13, 2020 proposal.

38.    Then, having apparently decided to pursue a potential sale, "[i]n October 2020, GW

engaged Radford, the independent compensation consultant of the Remuneration Committee…to review GW's severance plans and programs, relating to both ***change in control*** and non-change in control scenarios, and to make recommendations regarding potential changes to those plans and programs to resolve certain internal and geographical inconsistencies and to bring these plans and programs in line with current market practices for peer companies." Thereafter, as negotiations with Jazz intensified, Radford made certain recommendations, which the Renumeration Committee discussed and ultimately adopted, including regarding (1) GW entering into a new employment agreement with Gover (the CEO who conducted negotiations with Jazz) and (2) changes to GW's severance plans and programs "to resolve certain internal and geographical inconsistencies and to bring these plans and programs in line with current market practices for peer companies." Indeed, on January 25, 2021, as negotiations reached finality, the Reunumeration Committee specifically identified "the adoption of a company-wide severance program as had been recommended by Radford and discussed at previous meetings, matters relating to GW's incentive programs and other employee benefits matters" as "relating to the proposed transaction with Jazz" and "authorized senior management…to discuss and negotiate these matters with Jazz and its representatives." Thereafter, Gover and others negotiated these matters from January 26 through February 2, during which Jazz requested that members of GW management remain with the combined company after the completion of the transaction, some on a transitional basis and some on a more long-term basis, with Gover remaining for a transitional period.

39.    On February 2, 2021, during the same meeting at which they approved the Merger Agreement, the Board's counsel reviewed the employee compensation and benefits related matters that had previously been discussed, including GW's ability to implement a company-wide severance program as recommended by Radford and as previously discussed, the timing of GW's

2021 long-term incentive grants and the treatment of incentive awards and other employee benefit programs in the transaction, as well as certain contractual provisions and incentives that had been negotiated with Jazz so that the senior management team would remain with the combined company for a period deemed critical to the integration, with the members of the Remuneration Committee confirming that the resolution of these matters and negotiated contractual provisions and incentives were consistent with the terms they had discussed.

40.    The following day the parties executed the Merger Agreement. Then, later in February 2021, the Board adopted the Greenwich Biosciences Amended and Restated Change in Control and Severance Benefit Plan (the "U.S. Severance Plan") and the GW Change in Control and Severance Benefit Plan (the "UK Severance Plan," and together with the U.S. Severance Plan, the "GW Severance Plans").

41.    Although the proxy indicates that "[t]he determination to engage Radford for this matter was not made in contemplation of any particular transaction, whether with Jazz or any other party," the timing of this engagement and these changes cannot be ignored and demand further disclosure. Specifically, the Proxy must disclose additional information regarding (A) the genesis of the Company's deliberations and review concerning the Company's severance plans and benefits and/or the decision to engage a third-party consultant to advise on severance-related matters and (B) the timing and/or substance of the Board's discussions, deliberations, and/or decision(s) concerning (i) the Company's prior severance plan(s) and programs, the inconsistencies therein, and the participants in such plan(s), and (ii) whether and when the Company would engage a third-party consultant.

42.    The Proxy further fails to disclose to the Company's shareholders the specific changes effected by the adoption of the GW Severance Plans compared to the prior version(s) of

14

the plans. Indeed, based on a review of the Company's publicly disclosed filings, several executive officers previously executed "Participation Agreements" detailing their eligibility to participate in the original Greenwich Biosciences, Inc. Change in Control and Severance Benefit Plan.  It does not appear that Individual Defendant Gover executed a Participation Agreement, and it is therefore unclear what severance benefits, if any, Gover was entitled to under a change-in-control scenario before the new GW Severance Plans became effective in February 2021. It also appears that, as a result of the new GW Severance Plans, the Participation Agreements have been amended to provide additional severance benefits in the event of a change-in-control transaction, and for a tiered system of benefits, with Gover classified as "Tier 1" and receiving more benefits than other GW executive officers. According to the Proxy, as a result of the Proposed Merger, Individual Defendant Gover may receive as much as $39 million in golden parachute compensation, and shareholders are entitled to know how much of that compensation is a result of the new GW Severance Plans.

43.     Simply put, considering the timing of the engagement of Radford *in the middle of the process that culminated in the Proposed Merger* and the resultant amended GW Severance Plans, shareholders must be informed of the specific changes made to the severance benefits to be received by the Company's insiders in the event of a change-in-control transaction and/or involuntary termination. This information is necessary for shareholders to determine whether certain of the Individual Defendants, including Gover, were conflicted in their evaluation and negotiation of the Proposed Merger.

*** 

44.     In sum, the omission and/or misstatement of the above-referenced information renders statements in the Proxy materially incomplete and misleading in contravention of the

Exchange Act and in breach of the duty of candor/disclosure. Absent disclosure of the foregoing material information prior to the expiration of the Proposed Merger, Plaintiff and other GW shareholders will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Merger, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## <u>COUNT I</u>

**(Against All Defendants for Violation of Section 14(a) of the Exchange Act)**

45.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

46.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any Proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

47.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

48.     The omission of information from a Proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

49.    Defendants have issued the Proxy with the intention of soliciting the Company's common stockholders' support for the Proposed Merger. Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding the Company's projections, the valuation analyses performed by Goldman Sachs and Centerview in support of their fairness opinions.

50.    In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's stockholders although they could have done so without extraordinary effort.

51.    The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger; indeed, the Proxy states that the Financial Advisors reviewed and discussed their financial analyses with the Board, and further states that the Board considered the financial analyses provided by the Financial Advisors, as well as their fairness opinions and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted

from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review Goldman Sachs' and Centerview's analyses in connection with their receipt of the fairness opinions, question Goldman Sachs and Centerview as to their derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

52.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a Proxy by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

53.     GW is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

54.     The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Votes.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

55.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

56.    The Individual Defendants acted as controlling persons of GW within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of GW, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

57.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

58.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger.  They were thus directly involved in preparing this document.

59.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The

Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

60.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

61.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Proposed Merger or taking any steps to consummate the Proposed Merger, until the Company discloses the material information discussed above which has been omitted from the Proxy;

B.    Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D.    Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: March 18, 2021

**OF COUNSEL**

**KAHN SWICK & FOTI, LLC**
Michael Palestina
1100 Poydras Street, Suite 3200
New Orleans, LA 70163
Telephone: 504.455.1400
Direct: 504.648.1843
Facsimile: 504.455-1498
michael.palestina@ksfcounsel.com

**MONTEVERDE & ASSOCIATES PC**

*/s/ Juan E. Monteverde*
Juan E. Monteverde (JM-8169)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*